STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ANDREW PAULSON (CABN 267095)
MOLLY K. PRIEDEMAN (CABN 302096)
Assistant United States Attorneys

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    andrew.paulson@usdoj.gov
    molly.priedeman@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 22-CR-00104 YGR |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| ENRIQUE CHAVEZ, | |
| Defendant. | |

## I. INTRODUCTION

As a prison guard at FCI Dublin, Enrique Chavez held immense power over the lives of the women confined within its walls. The federal government invested him with this power in order to safeguard the lives of the women under his care. But in Chavez's hands, this power became a tool he wielded to manipulate the women he was supposed to protect—all for his own sexual pleasure. This has had devastating consequences for the vulnerable women he abused.

On October 27, 2022, Chavez pleaded guilty to one count of abusive sexual contact involving Victim 1. For the reasons set forth below, the government recommends a sentence of 16 months' imprisonment, 10 years supervised release, and a $100 special assessment.

## II. OFFENSE CONDUCT AND SENTENCING GUIDELINES CALCULATION

### A. Chavez's Pattern of Sexual Abuse at FCI Dublin

Chavez was a correctional officer at FCI Dublin who worked in the kitchen as a Cook Supervisor/Foreman. Presentence Investigation Report (PSR) ¶ 9. In that role, Chavez had supervisory and disciplinary authority over all the female prisoners. *Id.* He used that authority to victimize several women who worked under him in the kitchen. Victim 1 is one of those women. On multiple occasions over the course of several months, Chavez sexually abused Victim 1. Leading up to the abuse, Chavez flirted with Victim 1 and told her things such as "I have magic fingers" (a reference to digital penetration) and that he was into boobs and feet. *Id.* at ¶¶ 15, 25. Eventually, Chavez's grooming worked, and things turned physical. A few days after Chavez told Victim 1 he was into boobs and feet, Victim 1 showed Chavez her breasts. *Id.* at ¶ 25. Chavez then touched Victim 1's breasts and told her they were "nice." *Id.* This was just the beginning of a troubling pattern. Approximately three times per week for multiple months, Chavez grabbed Victim 1's breasts when the two were alone in his office. *Id.* at ¶ 20. It did not stop there.

In October 2020, Chavez met Victim 1 in the food service pantry for the first of two incidents of sexual abuse. *Id.* at ¶ 16. Once inside, Chavez locked the door and Victim 1 turned out the lights. *Id.* Chavez then put his hands inside Victim 1's underwear and touched her vagina and clitoris while she stroked his penis. *Id.* at ¶ 17. Chavez also grabbed Victim 1's breasts and sucked on her nipples. *Id.* at ¶ 18. After Chavez was done sexually abusing Victim 1, the two left the pantry and returned to work in the kitchen where Chavez was Victim 1's boss. *Id.* Chavez later told Victim 1 that he "liked her boobs, they're soft." *Id.*

This wasn't the only time Chavez sexually abused Victim 1. A couple weeks later, Chavez again met Victim 1 in the same pantry where he again kissed her and put his hands inside her underwear and touched her vagina. *Id.* at ¶ 19. On another occasion, surveillance video showed Chavez kissing Victim 1 and then kicking Victim 1 in the buttocks and pushing her in the breast area. *Id.* at ¶ 12. This abuse continued until Victim 1 saw Chavez enter his office alone with another prisoner, lock the door, and remain there for approximately 30 minutes. *Id.* at ¶ 21. When Victim 1 confronted Chavez about this and asked why he had locked the door if he didn't have anything to hide, Chavez responded, "Because I can." *Id.* at ¶ 22.

When he got caught abusing Victim 1, Chavez immediately began trying to save himself. As fellow prison guard A.J. told investigators, on the day A.J. was forced to relieve Chavez in the kitchen at the FCI Dublin Camp (Victim 1 was a prisoner at the Camp), Chavez (falsely) told A.J. that Victim 1 was lying, and, worried about how much of his sexual abuse had been captured on video, directed A.J. to search for hidden cameras in the Camp. *Id.* at ¶ 37. What's more, in a last-ditch effort to silence Victim 1, Chavez attempted to use the power he had so effectively employed to groom and then abuse Victim 1 in the first place by telling A.J. to instruct another prisoner to "beat [Victim 1's] ass." *Id.*

Victim 1 wasn't the only target of Chavez's abuse. Multiple prisoners told investigators about another inmate, M.G.P., who also worked for Chavez in the kitchen. One said she had witnessed Chavez receiving oral sex from M.G.P., while another said that she served as a lookout for Chavez while he had sex with M.G.P. in the kitchen. *Id.* at ¶¶ 39, 43. M.G.P.'s cellmate reported that she was aware that Chavez was sexually abusing M.G.P., and that she was afraid of Chavez as a result. *Id.* at ¶¶ 40-41. Several prisoners also said they either saw Chavez propose to M.G.P. while she was still a prisoner, or subsequently learned about it. *Id.* at ¶¶ 39, 42. Indeed, A.J. told investigators that he witnessed the prisoners who worked in the kitchen clapping and congratulating Chavez because he told them he had married M.G.P. in Mexico. *Id.* at ¶ 33. The relationship continued after M.G.P. was released from FCI Dublin in June 2020. Between June 2020 and February 2022, Chavez wired to M.G.P. more than $28,000, and in June 2022, three months after he was arrested in this case and ordered not to have any contact with former FCI Dublin prisoners, Chavez's sister wired almost $2,000 to M.G.P. *Id.* at ¶ 48. Chavez's phone also contained numerous sexually explicit photos of M.G.P. *Id.* at ¶ 47.

Chavez's abuse didn't stop with Victim 1 and M.G.P. FCI Dublin prisoner K.D. testified at the trial of former FCI Dublin Warden, Ray Garcia, that Chavez also targeted her for abuse. *See United States v. Ray Garcia*, Case No. 4:21-cr-00429-YGR (excerpt of testimony is attached to this sentencing memorandum). As K.D. testified, after Garcia was removed from FCI Dublin for sexually abusing inmates, Chavez instructed K.D. to be naked and masturbating for him when he did his rounds, telling her, "You did it for [Garcia], so you can do it for me." Trial Tr. 792:13-22, 793:25-794:4. This information is not in the PSR, but is nonetheless highly relevant to Chavez's sentencing in this case because it further illustrates the expansive scope of his sexual abuse of the women prisoners at FCI Dublin, and his

willingness to exploit his power for his own pleasure.

### B. Chavez's Objections to the Offense Conduct Are Meritless and Should Be Overruled

Chavez objects to broad swaths of the offense conduct based on nothing more than his bare, self-serving denials that the conduct in question occurred. Each of these objections are meritless and should be overruled.

Chavez begins by contesting facts that he admitted to in the Plea Agreement and under oath in open court during his change of plea. In his first objection, he admits touching Victim 1's vagina and clitoris, but denies putting his hand inside her underwear. Addendum to PSR ¶ 3. This flatly contradicts the plea agreement, which states that Chavez "put [his] hand *inside Victim 1's underwear* and knowingly touched her genitals." Plea Agreement ¶ 2(a) (emphasis added).[1]

Most of Chavez's other objections dispute statements from Victim 1 and other witnesses who saw Chavez engage in a plethora of sexual and other misconduct at FCI Dublin. The Court may—and should—consider all this information in determining an appropriate sentence. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G. § 1B1.4. The Court may consider hearsay at sentencing so long as the statements bear "some minimal indicia of reliability." *United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir.), *amended*, 992 F.2d 1015 (9th Cir. 1993). Each of the facts recited in the PSR contain substantial indicia of reliability, especially when considered against the lack of evidence presented by Chavez in response.

---

[1] If Chavez persists in this frivolous objection, the government may ask that the Court consider not granting Chavez a two-level reduction for acceptance of responsibility. In order to earn this reduction, U.S.S.G. § 3E1.1 requires that a defendant "truthfully admit[] the conduct comprising the offense(s) of conviction, and truthfully admit[] or not falsely deny[] any additional relevant conduct for which the defendant is accountable under § 1B1.3." That section further notes, "A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility . . . ." Given that Chavez already admitted to putting his hands "inside Victim 1's underwear" and knowingly touching her genitals, this objection, if maintained, constitutes a false denial and/or frivolous contest of conduct that is central to the offense of conviction. *See United States v. Rutledge*, 28 F.3d 998, 1002 (9th Cir. 1994), *as amended on denial of reh'g and reh'g en banc* (Oct. 5, 1994) ("[A] defendant has the right to remain silent regarding relevant, uncharged conduct; but, once he relinquishes that right and falsely denies such conduct, the district court may weigh the false denial in considering a reduction for acceptance of responsibility.").

With respect to Victim 1, Chavez has admitted the basic facts of the sexual encounter for which he pleaded guilty (except for the fact noted above) and the interaction that was caught on surveillance camera—things he cannot dispute with a straight face. PSR ¶¶ 12, 18. Beyond that, however, he contests nearly everything else Victim 1 told agents. Chavez's objections are meritless. For starters, surveillance video captured one of the encounters between Chavez and Victim 1, and Chavez admitted under oath to another of the sexual encounters. Moreover, many of Victim 1's statements are corroborated by other witnesses and/or information in the record, including that Chavez owned a home in Mexico, that he had a romantic relationship with a former FCI Dublin prisoner who lives in Mexico (M.G.P.), and details about his personal life. It makes no sense that Victim 1 told the truth only about the sexual abuse for which Chavez pleaded guilty or was caught on surveillance video engaging in, but invented everything else. Yet this is precisely the conclusion that Chavez urges the Court to make. The reality is that Victim 1 truthfully told agents about numerous instances of sexual abuse by Chavez, and there is no evidence to contradict her account.

The same is true for Chavez's other objections. Chavez objects to essentially all the facts provided by A.J., a fellow prison guard, and at least five other FCI Dublin prisoners, but provides no specific evidence to rebut any of those facts, or any explanation as to why these witnesses would fabricate this information about Chavez. This is especially true for the FCI Dublin prisoners, who are often confronted with retaliation, fear, and isolation at the hands of Chavez and his fellow guards whenever they report abuse such as this. PSR ¶¶ 51 (Victim 1 noting she has "extreme fear of retaliation"), 41 (inmate C.D. afraid of Chavez because he knew she was aware of his sexual abuse of M.G.P.). In this very case, Chavez tried to have another prisoner "beat [Victim 1's] ass" to deter Victim 1 from coming forward. *Id.* at ¶ 37.

Chavez's denial of a sexual relationship with M.G.P. while she was a prisoner at FCI Dublin is likewise inconsistent with the evidence. Multiple people personally witnessed the sexual relationship between Chavez and M.G.P. at FCI Dublin. Z.T.S., a prisoner who worked under Chavez, saw M.G.P. giving Chavez oral sex in the kitchen at the prison. PSR at ¶ 43. E.M.A., another FCI Dublin prisoner, told investigators that she served as a lookout while Chavez and M.G.P. had sex at the prison, and saw Chavez propose to M.G.P. and give her a ring. *Id.* ¶ 39. Fellow guard A.J. told agents that he personally witnessed prisoners at FCI Dublin clapping and congratulating Chavez after he told them that he had

married M.G.P. in Mexico. *Id.* ¶ 33. And C.D., yet another prisoner, told investigators that she was M.G.P.'s cellmate and that Chavez and M.G.P. were in a sexual relationship—facts that she recorded in a diary she provided to investigators. *Id.* ¶ 40-41.

Chavez's behavior after M.G.P. was released from FCI Dublin confirms that what began at FCI Dublin continued upon her release. As the PSR notes, Chavez wired to M.G.P. more than $28,000 over the course of 75 transfers between June 2020 and February 2022, and on eleven other occasions wired money to what appears to be family members of M.G.P. *Id.* ¶ 48. The first of these transfers occurred on June 11, 2020, a mere six days after M.G.P. was released from BOP custody. Even after he was arrested in this case, the transfers continued, with Chavez's sister wiring almost $2,000 to M.G.P. in June 2022—about three months *after* Chavez was ordered not to contact "any former or current FCI Dublin inmate, or any family member of a FCI Dublin inmate." *Id.*; Dkt. No. 13. Not only that, but Chavez's cellphone was littered with sexually explicit photos of M.G.P., including photos of M.G.P.'s exposed breasts and photos of M.G.P. and Chavez together kissing and engaging in other physical contact. PSR ¶ 47.

In short, Chavez's objections are baseless. Despite the fear of punishment and retaliation, Victim 1 and multiple other FCI Dublin prisoners came forward—at great personal risk to themselves and others— and truthfully told agents about the abuse they witnessed and experienced at the hands of Chavez. The information in the PSR is reliable and should be considered in determining Chavez's sentence.

**C. Chavez's Objections to the JSIN Data Should be Overruled**

Chavez objects to inclusion of JSIN data in the PSR. However, it is well established that district courts have broad discretion at sentencing to consider a wide range of information that could not otherwise be used or admissible in other settings. *See* 18 U.S.C. § 3661; *Concepcion v. United States*, 142 S. Ct. 2389, 2398 (2022) ("Such discretion is bounded only when Congress or the Constitution expressly limits the type of information a district court may consider . . . ."); *United States v. Tucker*, 404 U.S. 443, 446 (1972) ("[A] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come."). Chavez has not articulated an express statutory or Constitutional basis on which this Court must exclude the JSIN data. Insofar as Chavez attacks the persuasiveness or applicability of the data to his case, those claims go to the merits of the ultimate sentencing decision, not whether the JSIN data should be excluded from the PSR

altogether. Given that the JSIN data merely formalizes the Sentencing Commission's "longstanding practice of providing sentencing data at the request of federal judges by making some of the data provided through these special requests more broadly and easily available," there is no basis to exclude the data from the PSR. *See* United States Sentencing Commission, *What is the Judiciary Sentencing INformation (JSIN) platform?*, *available at* <https://www.ussc.gov/guidelines/judiciary-sentencing-information> (last accessed Feb. 2, 2023).

Nevertheless, to conserve future judicial resources, if after correctly calculating the Guidelines range and considering the Section 3553(a) factors the Court's sentence would have been identical had the Court not reviewed or considered the JSIN data, the government respectfully requests that the Court make a specific finding to that effect on the record at sentencing. *See, e.g.*, *United States v. Ceja*, 23 F.4th 1218, 1227 (9th Cir. 2022) ("[E]ven assuming the district court erred, . . . the error was harmless because there is no possibility that the court's resolution of [defendant's] factual objection would have affected his sentence."); *United States v. Ali*, 620 F.3d 1062, 1074 (9th Cir. 2010) ("If there was any error, the error was harmless in that there is no evidence any of these alleged errors, if changed, would result in a shorter sentence for any of the Defendants.").

### D. The PSR Accurately Calculates the Offense Level and Criminal History Category

The PSR correctly calculates the offense level as follows (PSR ¶¶ 56-64):

| Abusive Sexual Contact – 18 U.S.C. § 2244(a)(4) | | |
|---|---|---|
| | **U.S.S.G. Section** | **Level/Points** |
| Base offense level | § 2A3.4(a)(3) | 12 |
| Specific offense characteristics | § 2A3.4(b)(3) (victim in custody, care, or supervisory control of defendant) | +2 |
| Acceptance of responsibility | § 3E1.1 | -2 |
| Total offense level | | 12 |

The government also agrees with Probation's calculation of Chavez's Criminal History Category (CHC). Chavez has one juvenile conviction that does not score and no adult convictions. *Id.* ¶¶ 66-67. His CHC is therefore I. *Id.* ¶ 68. The Guidelines range for a total offense level of 12 and a CHC I is 10-

16 months. PSR ¶ 112.

## III. SENTENCING RECOMMENDATION

### A. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and
>
> (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B. The Government's Recommended Sentence of 16 Months is Sufficient but not Greater than Necessary

The seriousness of the offense, the history and characteristics of the defendant, and the need for specific and general deterrence all support a 16-month custodial sentence in this case.

#### 1. The Nature and Circumstances of the Offense Justify a 16-Month Sentence

The seriousness of this offense cannot be overstated. The power imbalance between the women imprisoned in FCI Dublin and guards such as Chavez could not be starker. Chavez used that power to repeatedly sexually abuse the vulnerable women he was supposed to protect—women who could not legally consent and who were not free to leave. Women like Victim 1. What began with flirtatious comments by Chavez about how he had "magic fingers" and was into "boobs" and feet, eventually escalated into Chavez sexually abusing Victim 1 on multiple occasions in the kitchen pantry and in his office. This was part of a pattern of sexual abuse—a pattern that included not only the two instances of

sexual abuse with Victim 1 in the kitchen pantry, but also Chavez grabbing Victim 1's breasts in his office on a regular basis. Victim 1 perhaps said it best: "Mr. Chavez is a vicious predator who preys on helpless, vulnerable, incarcerated women, and who knows how to use his power over women like me. I was trapped by his power and was in constant fear for my safety." PSR ¶ 51.

This fear was justified. After employing his power to sexually abuse Victim 1, Chavez attempted to use his power to silence her with violence. As fellow guard A.J. recounts, on the day Chavez was caught on camera kissing Victim 1, kicking her in the buttocks, and pushing her in the chest, he was sent from the prison to the camp. PSR ¶ 36-37. In an act emblematic of the tyranny and impunity with which Chavez approached his role as a prison guard, he told A.J. to have another prisoner at FCI Dublin "beat [Victim 1's] ass." *Id.* at ¶ 37.

This has all had devastating effects on Victim 1. The fear Chavez struck in Victim 1 has caused her to "endure[] feelings of extreme fear of retaliation, fear of being placed in solitary confinement isolation to keep quiet, and fear of having taken away from me the few things I have in prison." PSR ¶ 51. For her, this will not end: "The trauma I have endured will severely affect me for the rest of my life." *Id.* Victim 1, like all the other women who were sent to FCI Dublin, was paying a debt to society—a debt that did not include being sexually abused by one of the men who had power over her. Because of Chavez's actions, Victim 1 is left to grapple with the pain of this abuse for years to come.

Victim 1 wasn't the only one. As discussed above, multiple inmates personally witnessed Chavez's sexual abuse of M.G.P. Chavez apparently continued that relationship even after M.G.P. was no longer his prisoner. But it didn't stop there. Chavez also facilitated the abuse of other prisoners by other prison guards. As A.J. told agents, Chavez made frequent comments to A.J. about another prisoner named C.V., that, in hindsight, A.J. believes were aimed at trying to "hook up" A.J. and C.V. PSR ¶¶ 28-32. Moreover, when A.J. told Chavez that one of the prisoners may have made a sexual pass at him, Chavez responded by telling A.J. not to worry because things like that happened at FCI Dublin. *Id.* at ¶ 31.

The abuse of power in this case demands a meaningful sentence. As Judge Gilliam said recently in the sentencing of James Highhouse, another FCI Dublin prison guard who also sexually abused the women under his care, "[I]t's very clear to the Court that this offense was an egregious abuse of the public trust that comes with serving in a correctional institution. The defendant violated the oath that he swore to

uphold the Constitution and fulfill his duty as a public servant. And that egregious abuse . . . had devastating consequences for physically and emotionally vulnerable women and has caused them lasting and devastating harm." *United States v. Highhouse*, Case No. 4:22-cr-00016-HSG, Dkt. No. 29, Sentencing Tr. 11:7-15. So too here. Chavez abused this trust and abused his power repeatedly with multiple prisoners who could not legally consent. For that alone, a sentence of 16 months is justified.

**2. A 16-Month Sentence is Necessary to Afford Adequate Deterrence**

A lengthy prison sentence is also necessary to accomplish specific and general deterrence. As the PSR shows, Chavez sexually abused multiple women under his care over the course of multiple months. Encapsulating the sense of authority and entitlement with which Chavez approached his duties as a prison guard is his response to Victim 1's inquiries into why Chavez had spent so much time alone in his locked office with another prisoner: "Because I can." *Id.* ¶ 22. Chavez made clear that nothing was going to stop him from using the women at FCI Dublin for his own sexual pleasure. Indeed, the removal of former warden Ray Garcia was not enough to deter Chavez. Quite the opposite.

After Garcia was forced to leave FCI Dublin when law enforcement learned that he was sexually abusing prisoners, Chavez saw the moment not as a lesson, but as an opportunity. With Garcia out of the picture, Chavez moved in, targeting K.D. for further abuse. As K.D. testified, after Garcia was removed from FCI Dublin, Chavez instructed K.D. to be naked and "play with [herself]" when Chavez did rounds. Why? In Chavez's words, "You did it for [Garcia], so you can do it for me." Garcia Trial Tr. 792:16-21. Chavez's targeting of a female prisoner for sexual abuse is bad enough, but deliberately targeting a female prisoner who he knew was the victim of abuse by another guard (the warden, no less) represents a different level of depravity. It also shows that Chavez viewed the women at FCI Dublin not as human beings, but as objects that he could use for his own sexual gratification. And the fact that he did this *after* Garcia got caught shows that Chavez thought he was untouchable. A strong prison sentence is necessary to show Chavez that he is not above the law, and to deter him from future abuse.

A meaningful sentence is also necessary to deter others from engaging in similar abuses. For far too long, Chavez and other prison guards like him have abused the powerless women at FCI Dublin with impunity, secure in their ability to use their power to deter their victims from coming forward, sometimes—as in this case—with violence. PSR ¶ 37 (Chavez told A.J. to have another inmate "beat

[Victim 1's] ass").[2]  Enough is enough.  The sentence in this case must send a message not just to Chavez, but to every prison guard at FCI Dublin and throughout the Bureau of Prisons, that if they betray the oaths they took as public servants by using their power to prey upon some of society's most vulnerable women—women who cannot say no, women who are literally prisoners of their abusers—then significant consequences will follow.  As Judge Gilliam put it, "[I]t is important that the world see that this egregious conduct carries egregious and serious consequences in terms of penalty."  Highhouse Sentencing Tr. 13:23-14:1.  A 16-month sentence is necessary in this case to send that message.

## IV. CONCLUSION

For the foregoing reasons, the United States recommends that the Court sentence Chavez to 16 months' imprisonment, 10 years' supervised release, and a $100 special assessment.

DATED:  February 2, 2023

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

*/s/ Andrew Paulson*
ANDREW PAULSON
MOLLY K. PRIEDEMAN
Assistant United States Attorneys

---

[2] To date, four other FCI Dublin prison guards have been charged with sexually abusing the female prisoners there.  Former FCI Dublin Warden Ray Garcia was tried and convicted of sexually abusing three prisoners and lying to the FBI about it.  He is awaiting sentencing.  *United States v. Garcia*, Case No. 4:21-00429-YGR.  Former chaplain James Highhouse pleaded guilty to sexually abusing one prisoner and lying about it to the Department of Justice Office of Inspector General.  He was sentenced to 84 months confinement.  *United States v. Highhouse*, Case No. 4:22-cr-00016-HSG.  Correctional Officer (CO) Ross Klinger has pleaded guilty to sexually abusing three prisoners and is awaiting sentencing.  *See United States v. Klinger*, Case No. 4:22-cr-00031-YGR.  CO John Bellhouse has been charged with sexually abusing three prisoners and is awaiting trial.  *United States v. Bellhouse*, Case No. 4:22-cr-00066-YGR.

# ATTACHMENT

                                    **Volume 5**

                                    **Pages 730 - 911**

             UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,            )
                               )
  VS.                          )     **NO. CR 21-00429-YGR**
                               )
RAY J. GARCIA,                 )
                               )
          Defendant.            )
_____)

                         Oakland, California
                         Thursday, December 1, 2022

            **TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    **STEPHANIE M. HINDS**
                    United States Attorney
                    1301 Clay Street, Suite 340S
                    Oakland, CA  94612
               BY:  **MOLLY PRIEDEMAN**
                    **ANDREW PAULSON**
                    **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                    SUMMIT DEFENSE, APLC
                    4040 Civic Center Drive, Suite 200
                    San Rafael, CA  94903
               BY:  **JAMES T. REILLY, ESQUIRE**

Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
              Official Reporter

```
 1  assume is why I saw medical the next day for the PREA
 2  assessment.
 3          However, he has never heard anything coming back on it,
 4  but I also had my friend report this incident and many other
 5  forms as well.
 6  Q.  Okay.  I'm not sure I'm clear on that.  Who is this friend
 7  you're talking about?
 8  A.  My friend, Mr. Hewsman.
 9  Q.  Is this a staff member?
10  A.  No.  This is my friend from home.
11  Q.  Okay.  Someone outside the facility?
12  A.  Yes.  Because FCI Dublin couldn't get me the PREA hand --
13  I'm sorry, the PREA standards and handbook, and so I
14  required -- requested my friend to do so, which got there
15  roughly a week later after being sent around in circles at FCI
16  Dublin for over a month.
17  Q.  And then you -- you also indicated that on August the 4th
18  of 2021, that someone spoke to a captain about this?
19  A.  I spoke to the captain.
20  Q.  That was you that did that?
21  A.  Uh-huh.
22          And then eight months later, I did it again to a different
23  captain that was there, because nothing had happened and I
24  still didn't feel safe for myself from staff or inmates.
25  Q.  So even months after Mr. Garcia left, you still had
```

1  concerns about your safety?
2  **A.** Yes.
3  **Q.** So, obviously, they were not related in any way to him,
4  those concerns.
5  **A.** Oh, no, those concerns were definitely related to him.
6  **Q.** Did you think he still had the influence over someone that
7  could cause you a problem?
8  **A.** I was still dealing with lots of retaliation at that point
9  from reporting him, so yes.
10 **Q.** Did you have any specific reason from anything that anyone
11 said to you that indicated that any of this retaliation was
12 being motivated directly by Mr. Garcia?
13 **A.** I had another staff member ask me during their evening
14 watch, which is the -- I'm not even sure if they consider it
15 evening or graveyard, but the watch from 10:00 p.m. to 6:00
16 a.m. One of them asked me if I would play for them, as in play
17 with myself, be naked playing when they came around for their
18 round. I said no.
19       And he specifically told me, "Well, you did it for him,"
20 as in your defendant. They just called him by name. "You did
21 it for him, so you can do it for me." So, yes, I would say the
22 retaliation did stem from your defendant.
23 **Q.** All right. But the point I'm making is you didn't have
24 any reason to believe that Mr. Garcia told this particular
25 staff member to approach you for that purpose.


1   **A.** I'm not at liberty to say if he told him or not. I wasn't
2   there for the discussion if they did have it, and I couldn't
3   tell you if they did or didn't have it.
4   **Q.** Okay. So --
5   **A.** But there should be no other reason why that staff member
6   would know that anything like that would ever happen if it
7   wasn't from him.
8       Does that answer your question?
9   **Q.** I'm not sure I understand what you mean.
10      Are you saying you think that he knew about the contact
11  between yourself and Mr. Garcia because Mr. Garcia told him
12  about it?
13  **A.** Well, I certainly did not tell him about it.
14  **Q.** Okay. But -- but you don't have any specific knowledge
15  from which you could say that Mr. Garcia, after leaving the
16  facility on the 21st of July, contacted some other staff member
17  and said, "Hey, go approach Katrina about some kind of sexual
18  conduct"?
19  **A.** After he left?
20  **Q.** Yes.
21  **A.** Not necessarily. While he was still there, it's quite
22  possible.
23  **Q.** Do you have any reason to -- any specific information that
24  that ever happened?
25  **A.** Specific information that it happened? No. But, again,

1  that staff member, who at the time was my boss in the kitchen,
2  would have had --
3  **Q.**   What was his name?
4  **A.**   Something or other Chavez, E. Chavez, I guess.
5       He would have had no knowledge of the matter going on.
6  **Q.**   Okay.  So I'm going to ask the question again.
7  **A.**   Okay.
8  **Q.**   Do you have any specific information to indicate that
9  Mr. Garcia ever told Mr. Chavez that he should address with you
10 the possibility of some kind of sexual conduct?
11 **A.**   Considering that he said -- as in Chavez said that
12 Garcia -- or that if I could do it for Garcia, then I can do it
13 for Chavez, just so you don't misinterpret their names, I would
14 have to assume that Mr. Garcia at some point likely told Chavez
15 something.  Because I sure didn't tell Chavez anything.  I
16 didn't feel comfortable talking about it with anybody at the
17 compound staff-wise.
18 **Q.**   All right.  I'm going to ask it one more time.
19      Do you have any specific information to indicate that
20 Mr. Garcia told Mr. Chavez that he should approach you about
21 this sexual conduct?  Other than your own assumptions about
22 what you think may have happened, did you hear such a
23 conversation?  Did someone tell you that such a conversation
24 took place?
25 **A.**   Again, none of those conversations happened in my

|   |   |
|---|---|
| 1 | presence. |
| 2 | **Q.** Okay. |
| 3 | **A.** There would be no reason for him to have knowledge of |
| 4 | anything if a conversation didn't take place. |
| 5 | **Q.** And there would be no reason for you to have any knowledge |
| 6 | as to what motivated him to approach you either, would there? |
| 7 | **A.** Other than that he said if I could do it for Garcia, I |
| 8 | could do it for him, no. |
| 9 | **THE COURT:** Is this a good breaking point? |
| 10 | **MR. REILLY:** Your Honor, I'm about maybe two minutes |
| 11 | away from finishing. |
| 12 | **THE COURT:** Is there going to be redirect? |
| 13 | **MR. PAULSON:** Well, depending on these two minutes, I |
| 14 | do not believe so, Your Honor. |
| 15 | **THE COURT:** Okay. All right. Go ahead. Two minutes. |
| 16 | **MR. REILLY:** All right. Thank you, Your Honor. |
| 17 | **Q.** Subsequent to these conversations with Correctional |
| 18 | Officer Chavez, have you had any other conversations with |
| 19 | anyone who desired to have some contact with you? |
| 20 | **MR. PAULSON:** Objection, Your Honor. Relevance. |
| 21 | **THE COURT:** Relevance? |
| 22 | **MR. REILLY:** I'll rephrase it, Your Honor. |
| 23 | **Q.** Do you have any reason to believe that any other |
| 24 | correctional officer acted as a result of conduct by Mr. Garcia |
| 25 | with respect to contacting you? |

```
 1
 2
 3                    CERTIFICATE OF REPORTER
 4         I certify that the foregoing is a correct transcript
 5   from the record of proceedings in the above-entitled matter.
 6
 7   DATE:   Thursday, December 1, 2022
 8
 9   /s/ Pamela Batalo Hebel
10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
     U.S. Court Reporter
11
12
```